W. Willard **WIRTZ**, Secretary of Labor, United States Department of Labor, Plaintiff,

v.

**LOCAL UNION NO. 1622, UNITED BROTHERHOOD OF CARPENTERS AND JOINERS OF AMERICA, AFL-CIO**, an unincorporated association, Defendant.

No. 44875.

United States District Court
N. D. California.

June 7, 1968.

Cecil F. Poole, U. S. Atty. by Robert N. Ensign, Asst. U. S. Atty., San Francisco, Cal., for plaintiff.

Victor J. Van Bourg of Levy, DeRoy, Geffner & Van Bourg, San Francisco, Cal., for defendant.

## MEMORANDUM OPINION; FINDINGS OF FACT AND CONCLUSIONS OF LAW

WOLLENBERG, District Judge.

This is an action brought by the Secretary of Labor under Title IV of the Labor-Management Reporting and Disclosure Act of 1959 (29 U.S.C. § 481 et seq.) [hereinafter referred to as the Act] to declare the election held by defendant union on June 19, 1965 to be null and void, and to direct the conduct of a new election under the supervision of plaintiff.

The complaint alleges that defendant Union held nominations of officers in May, 1965, and an election of officers on June 19, 1965; that a member in good standing, Fuller, invoked all the remedies under the parent union's constitution and the defendant union's by-laws in protesting and appealing said election; that his protest and appeal was denied by the General President of the parent union; that having had no final decision made on his appeal to the General Executive Board of the parent union within three calendar months after instituting the same, said member filed a complaint, on October 18, 1965, with the Secretary alleging violations of sec-

tion 401 of the Act (28 U.S.C. § 481) in the conduct of the election; that the Secretary then proceeded to investigate the matter after a subpoena duces tecum was made ordering the union to produce its records; that as a result of the investigation, plaintiff found probable cause to believe that a violation of Title IV of the Act had occurred with respect to the aforesaid election and had not been remedied at the time of suit.

The violations alleged by the Secretary were:

1) Failure of the defendant Union to mail notices of the election to all its members in good standing, as is required by Section 401(e) of the Act [29 U.S.C. § 481(e)].

2) Defendant union did not provide adequate safeguards to insure a fair election, as required by Section 401(c) of the Act, [29 U.S.C. § 481(c)], with the result that the ballots cast for the office of Trustees were inaccurately counted and Marius Waldal was erroneously declared to have been elected as a Trustee.

3) Failure of defendant Union to provide a reasonable opportunity for the nomination of candidates, as required by Section 401(e) of the Act, [29 U.S.C. § 481(e)] in that it did not give adequate notice of the nomination meeting. All of these violations, it is alleged, may have affected the outcome of the election, and have not been corrected.

Defendant's answer to the complaint asserted that the Court only had jurisdiction of the action as to those matters which were the subject of Fuller's complaint to the union, which only covered the election of Trustee and the failure to provide adequate safeguards therefor.

The matter was submitted for decision upon stipulated facts as set out in the pre-trial order, subject to the right of each party to object to the relevancy of these facts. This was supplemented by an additional pre-trial order, and the affidavit of Vyrl Anderson, Financial Secretary of defendant union. (Def's. Ex. A).

The facts, as stipulated to in the pre-trial order are as follows:

Local Union No. 1622, United Brotherhood of Carpenters and Joiners of America, AFL–CIO, hereinafter referred to as "Local 1622", is a labor organization and an unincorporated association maintaining its principal office at 1050 Mattox Road, Hayward, Alameda County, California. Local 1622 is a member organization of the Bay Counties District Council of Carpenters, which is the certified representative of employees of member employers of the Associated Home Builders of the Greater East Bay, Inc., under the provisions of the National Labor Relations Act, as amended.

On Saturday, June 19, 1965, Local 1622 held its regularly scheduled biennial election of officers, business agents, and delegates to the Bay Counties District Council of Carpenters and the Alameda Building and Construction Trades Council. Nominations had taken place at the meeting held by Local 1622 on May 14, 1965. The officers elected in this election were elected for two-year terms of office.

The "East Bay Labor Journal", hereinafter referred to as EBLJ, is a weekly newspaper published in Oakland, California. It has long been designated as the official newspaper of organized labor for Alameda County, California, and, as such, has been used as the official newspaper of Local 1622 and the vehicle for advising Local 1622's membership of nominations and elections. The "Official Union Notices" section of the June 4, 1965 issue of the EBLJ set forth the date, time and place of the coming election, together with the names of all candidates and offices to be filled. In previous issues of this weekly newspaper (for April 16, April 23, April 30, May 7 and May 14, 1965), there had also been announcements of the election and nominations meeting in the "Official Union Notices" section. Names of candidates were, of course, absent from these earlier

announcements but the date, time and place of the May 14 nomination meeting had been given. Copies of the announcements in the EBLJ of April 16, April 23, April 30, May 7, May 14, and June 4, 1965 are attached to the pre-trial order as Exhibits A, B, C, D, E, and F.

Issues of EBLJ are sent by mail to all members of Local 1622 for whom the paper has current names and addresses. All address changes or membership changes normally are communicated to EBLJ by the Union. Changes of address are, however, occasionally initiated by EBLJ itself in those instances where the member himself undertakes to provide a change of address or where a paper is returned to EBLJ by the Post Office unclaimed. As each "change slip" or other notice of change reaches EBLJ an addressograph plate will either be added, changed, or deleted, as the case might be. For each addressograph plate, there is a corresponding index card which is kept in an alphabetized file on a Union-by-Union basis. EBLJ does not maintain a mailing list, as such, although it does, from time to time, on request from one of its client unions, run off such a list for the particular client's use in comparing Union records with EBLJ plates.

Local 1622 did not maintain any mailing list or other membership list as such, and never made such a specific request for a list from EBLJ, prior to this election. EBLJ sent out 2,319 issues to Local 1622 members for the month of June 1965. Although Local 1622 did not have a membership list as such, according to its monthly per capita tax report for June 1965 (prepared for the International and containing a list of the total number of members and their current dues status), it had 2,701 members in good standing during that month (Exhibit G). Such per capita lists were prepared each month in the office of Financial Secretary-Treasurer Vyrl O. Anderson, under his supervision.

At the end of each month, Local 1622 received a bill from EBLJ for the total number of newspapers sent out to Local 1622 members during the previous month. The EBLJ bill was sent to Local 1622's Financial Secretary-Treasurer, Vyrl O. Anderson, who, together with Local 1622 President W. A. (Walt) Williams, would sign the check paying such bill. Such bills would normally be paid within one month of their receipt.

During its investigation of violations alleged to have occurred in Local 1622's June 19, 1965 election, representatives of the U. S. Department of Labor determined that the EBLJ's billing figures were approximately 153 newspapers short of the total number actually sent out to members due to EBLJ's clerical error. Thus, while EBLJ's billings from January to May varied from showing a high of 2,189 weekly issues sent out for the month of January, 1965 to showing a low of 2,130 sent out in March, 1965, the actual numbers sent out were 2,343 and 2,284 issues, respectively. The billing of June, 1965 was for 2,166 issues (Exhibit H). During this same period (January through May 1965) Local 1622's per capita reports showed that approximately 2,700 members were in good standing each month. The EBLJ also is subscribed to by seven other carpenter Local Unions in Alameda County.

More than a month prior to the regularly scheduled June 1965 election, Local 1622's Financial Secretary, Vyrl O. Anderson, did propose to establish a list of eligible voters by rubber stamping the designation "Eligible to Vote" on eligible members' quarterly working cards (these cards are identification cards showing the members' dues status) and on the April 1965 per capita list for such eligibles. The use of this procedure was, however, opposed by A. W. "Tony" Rice, who, as Recording Secretary, was also Clerk of Elections under the Union Constitution. The matter was thereupon referred to the General President of the United Brotherhood of Carpenters and Joiners of America, AFL–CIO (hereinafter referred to as "United Brotherhood"), who designated and appointed General Representative James C.

Curry to supervise the conduct of the election, and the officers of Local 1622 were so advised.

If called to testify in this matter, Local 1622's Financial Secretary-Treasurer Anderson and General Representative Curry would both testify to a lack of knowledge that there was a discrepancy between the total membership figure shown on the per capita list and the total number of issues sent out to members by EBLJ.

The voting, which took place between 7:00 a. m. and 5:00 p. m. on June 19, 1965 at Local 1622's Union Hall in Hayward, California, was supervised by General Representative Curry. Although Business Representatives, Sick Committeemen and delegates were among those voted for, since they were not officers (within the meaning of the LMRDA), they are not discussed here and are not involved in this action. A total of 682 members voted in the election. The counting and tallying of ballots was begun at 6:30 p. m. on June 19 by the Election Committee, consisting of a Judge, A Clerk and 16 Tellers, and was carried out under General Representative Curry's supervision. All Election Committeemen had been on duty since about 7 a. m. that morning. The count and tally process continued uninterrupted throughout the entire night and was completed the next day some time between 5:30 a. m. and 7:00 a. m.

An initial posting of the results was made on a set of sample ballots headed "First Count of Tally Sheets". This count showed that in the contest for the third of three Trustee positions, Chester Linn was the winner with 281 votes and Marius Waldal and Louis A. "Lou" Fuller were the losers, receiving 278 and 276, respectively. At this time, one of the Committeemen, Clyde Mills, stated to Curry his feeling that the tally might be inaccurate due to the lack of sleep and the age (over 65) of some of the participants in the tally process. On the next day, Monday, June 21, General Representative Curry called back several Election Committee members for a second over-all tally. No recount (as opposed to a retally), however, was made, or requested by Curry. In this second tally, Chester Linn was determined to have received 276 votes in a tie with Fuller, Waldal having won with 278 votes.

Following the posting of the final election results (Exhibit I) General Representative Curry wrote a letter dated July 3, 1965, to Local 1622's Recording Secretary, Tony Rice, concerning certain requests by Local 1622 members for a recount of ballots (Exhibit J). This letter was publicly read to the membership at Local 1622's regular meeting of July 9, 1965 and further discussion of the recount problem was had at this time. As a result of this discussion Local 1622 communicated with the United Brotherhood (Exhibit K) by letter of July 11, 1965 requesting the United Brotherhood to hold a recount of ballots. A reply letter, dated August 2, 1965 from General President Hutcheson to Tony Rice, denied such request for a ballot recount (Exhibit L). At the time of such letter, the United Brotherhood was aware that, following the election General Representative Curry had conducted an investigation into allegations of error in the ballot count and had prepared a report of his findings.

Louis A. Fuller, as a member in good standing of Local 1622, had filed a letter with the United Brotherhood on July 12, 1965 to request a recount of the results of the election for third Trustee (Exhibit M). This written request was in addition to a previous oral request for a rerun of the third Trustee position made by Fuller to General Representative Curry just after the June 19 election. Fuller was advised by letter of August 2, 1965, that his request for a recount was denied and his appeal dismissed (Exhibit N). On August 8, Fuller wrote a letter to the General Executive Board appealing the denial of the August 2 decision (Exhibit O). By letter of September 21, 1965, R. E. Livingston, General Secretary, advised Fuller that his appeal would be heard at the next regular Executive Board meeting of the

United Brotherhood (Exhibit P). Fuller had received no further communication from the United Brotherhood as of October 12, 1965. Fuller filed his complaint with the Secretary of Labor on October 18, 1965 (Exhibit Q).

The following technical assistance was rendered to Fuller, during the months preceding the filing of his complaint with the Secretary of Labor, by various representatives of the Office of Labor-Management and Welfare-Pension Reports (San Francisco Area Office) of the U. S. Department of Labor, hereinafter referred to as LMWP:

(1) On July 19, 1965 Fuller telephonically contacted LMWP Compliance Officer Harold Terfansky to say that he had sent an appeal to General President Hutcheson. (See Exhibit M, above). Fuller was advised by Mr. Terfansky of the right to proceed under section 402 of the LMRDA (29 U.S.C. § 482).

(2) On August 12, 1965 Fuller came to the San Francisco Area Office of LMWP and spoke to Area Director Holland. He told Holland that he had received a letter from the General President turning down his appeal (see Exhibit N above). Holland advised Fuller of the requirement of the United Brotherhood Constitution that he write the General Executive Board and also told Fuller to contact LMWP if he had either received a final answer or had not received any answer from the Executive Board by September 12, 1965. Fuller agreed to do so and to send LMWP a copy of such further appeal letter.

(3) On September 8, 1965 Fuller telephonically contacted Holland and was advised once more of the need to receive a final answer or no answer at all by September 12. On the same day Fuller telephoned Terfansky, asked the same question, and received the same answer as during his conversation with Holland.

(4) On October 15, 1965 Fuller came again to the San Francisco Area Office and went over all of the previous activities once more with Compliance Officers A. A. Martinez and Walter I. M. Brock-

bank. Fuller discussed the election, his letters of appeal, his requests for a recount of the third Trustee position ballots, the written and oral responses (on a Local and the United Brotherhood level) to his requests and the procedure to be followed to file a complaint with the Secretary of Labor. In accordance with his request, Mr. Fuller was given assistance by Martinez and Brockbank in the drafting of his complaint and the final draft was typed by a secretary in the LMWP office that afternoon. Fuller was told to mail the letter to the San Francisco Area Office by October 18 if he decided to file a formal complaint. The letter was unsigned at the time and no envelope was prepared although Fuller was given the address of the LMWP office. On this occasion, and in all of his contacts with LMWP officials (always initiated by Fuller, who is over 72 years old) he appeared to have some difficulty in expressing himself.

On October 18, 1965 Fuller's complaint to the Secretary of Labor was received by the San Francisco Area Office of LMWP and on October 19, 1965, LMWP instituted an investigation of Local 1622's June 19 election. In connection with such investigation, the Department of Labor issued a Subpoena Duces Tecum which ordered the production of papers, etc., relating to the conduct of the entire election rather than merely to the contest for office of third Trustee. Contending that such Subpoena Duces Tecum and such investigation of the entire election was beyond the scope permitted by the law, and upon the representation to Local 1622 by LMWP Area Director Holland that the latter intended, if necessary, to go beyond an investigation of the third Trustee office, Local 1622 did refuse to comply with such Subpoena. The Secretary of Labor thereupon instituted proceedings on December 7, 1965 to compel compliance with such Subpoena (N.D.Calif.S.D.—Civil No. 44487), and an Order to Show Cause was issued December 8, 1965. On January 12, 1966 an order was issued directing the named Local 1622 officials to comply. There-

upon, such officials did comply. Copies of all pleadings and papers filed in that action are attached to the pre-trial order as Exhibits R, S, T, U and V.

During the course of their subsequent investigation the LMWP officials determined, after a complete ballot recount, that there had been an error in the local's count for the position of third Trustee and no such error in the count was revealed as to any other office. This investigation revealed that whereas Marius Waldal (incumbent) had been declared the winner, there had actually been a tie vote for this Trustee position, Fuller and Waldal each having received 277 votes. The tally for Chester Linn, 276 votes, was correct.

Both the October 18, 1965 filing of Louis A. Fuller's complaint with the Secretary of Labor, and the March 11, 1966 filing of the Secretary of Labor's civil action complaint in this Court were timely.

On February 18, 1966, a representative of the Secretary of Labor delivered to Mr. Francis X. Ward, General Counsel of the United Brotherhood, at its general office headquarters in Washington, D. C., a letter addressed to General President Hutcheson stating a summary of the results of the LMWP investigation in this matter, and a copy of this letter was also forwarded by LMWP to Local 1622 through the mails. A copy of this letter is attached to the pre-trial order as Exhibit W. No response to this letter has been received from either the United Brotherhood or Local 1622.

In the supplemental pre-trial order, it was stipulated that defendant had conducted an election of officers on June 10, 1967. The affidavit of Vyrl Anderson so states, and further asserts that the complaining member Fuller was not nominated for office nor did he run for office. Lastly, no protest has been filed by any person with respect to said election.

Defendant's jurisdictional argument is that since the Secretary may only bring suit after a complaint has been filed with the union, the Secretary's complaint must be limited only to those issues raised in the complaint of the union member. As applied to the instant case, this argument would mean that the Secretary may only institute suit with regard to Fuller's complaint relating to his candidacy for the office of Trustee.

The Secretary's position is that his function is broader and was not intended by Congress to be limited to the specific complaint of a union member.

The Supreme Court has recently sided with the Secretary's position in Wirtz v. Local Union No. 125, Laborers' International Union of North America, AFL–CIO, 389 U.S. 477, 88 S.Ct. 639, 19 L.Ed. 2d 716 (1968). [hereinafter referred to as Wirtz v. Laborers' Union]. That case involved a complaint by a union member concerning a runoff election, which alleged that certain union members who were listed as eligible to vote were not in fact eligible. The Secretary filed suit challenging not only the runoff election and the method there used to determine eligibility, but also the general election and the same methods which were used to determine eligibility. Against the Union's argument that the Secretary should only be allowed to challenge the runoff election, the Supreme Court held:

"On the *facts of this case* we think the Secretary is entitled to maintain his action challenging the June 8 general election because respondent union had *fair notice* from the violation charged by Dial in his protest of the runoff election that the *same unlawful conduct* also occurred at the earlier election." 389 U.S. at 481, 88 S.Ct. at 641. [Emphasis supplied].

The Court reasoned that Congress did not intend the Secretary's enforcement action to be "immutably fixed by the artfulness of a layman's complaint which often must be based on incomplete information", but rather intended to use the "expertise and resources of the Labor Department". (389 U.S. at 482, 88 S.Ct. at 642). The Secretary's role in protect-

ing the public interest in insuring "free and democratic union elections" (389 U.S. at 483, 88 S.Ct. at 642) would be severly hampered if used "merely to protect the right of a union member to run for a particular union office in a particular election." (389 U.S. at 483, 88 S.Ct. at 642). The Court recognized that Congress intended that unions be given the first opportunity to correct alleged violations of the Act; "however, unions were expected to provide responsible and responsive procedures for investigating and redressing members' election grievances." (389 U.S. at 484, 88 S.Ct. at 642). If the union, as a result of the filing of a member's complaint, "had a fair opportunity to consider and redress [a violation] in connection with a member's initial complaint" (389 U.S. at 484, 88 S.Ct. at 643), then the Congressional purpose of promoting union self government would not be thwarted.

The case at hand differs from Wirtz v. Local Union No. 125, etc., supra, in that here the additional allegations of the Secretary's complaint raised matters not mentioned in the member's complaint to the Union, specifically, the failure of the Union to give *notice* of the nomination and election to various members. In Wirtz v. Laborers' Union, supra, the union had notice of the alleged violations, albeit only in regard to the runoff election and not the general election.

■ This distinction might be important if the challenge here was directed to procedures other than the giving of notice of an election. "A legal notice of election is too fundamental a requirement to be made dependent on a private complaint to put it in issue when the election is being contested. Evidence concerning proper compliance with the specific command of the statute and union constitution that notice of election be mailed to each member at his last known address normally would be available only to the incumbent union officers." Wirtz v. Local Union 169, International Hod Carriers', etc., 246 F.Supp. 741, 752 (D.Nev.1965).

Moreover, the Secretary points out that the union had a "fair opportunity" to correct the alleged violations, since it was put on inquiry notice as to the general election by other complaints addressed thereto, although these complaints were not the subject of a formal complaint to the Secretary. Also, the union was given an opportunity to correct the alleged violations by the Secretary's letter of February 16, 1966, which informed the union of the charges it proposed to file and gave the union reasonable time to avoid institution of these proceedings by amicably setting the matter. The Supreme Court has recently emphasized the importance of the settlement authority of the Secretary as the final step prior to official court intervention. In Wirtz v. Local 153, Glass Bottle Blowers Association, etc., 389 U.S. 463, 472, 88 S. Ct. 643, 649, 19 L.Ed.2d 705 (1968), infra, it stated: [hereinafter referred to as Wirtz v. Bottle Blowers Ass'n]

"Even when an election violates these standards, the stated commitment was to postpone governmental intervention until the union was afforded the opportunity to redress the violation. This is the effect of the requirement that a complaining union member must first exhaust his internal union remedies before invoking the aid of the Secretary. 29 U.S.C. § 482(a). And if the union denies the member relief and he makes a timely complaint to the Secretary, the Secretary may not initiate an action until his own investigation confirms that a violation of § 401 probably infected the challenged election. *Moreover, the Secretary may attempt to settle the matter without any lawsuit; the objective is not a lawsuit but to 'aid in bringing about a settlement through discussion before resort to the courts.'* Calhoon v. Harvey, supra [379 U.S. 134, 85 S.Ct. 292, 13 L.Ed.2d 190]." [Emphasis supplied].

■ We think on the basis of the foregoing authorities that the Secretary could properly file the instant complaint challenging both the Trustee election as

well as the entire election, notwithstanding the fact that Fuller's initial complaint to the union did not encompass the alleged violations concerning notice. Hence, this Court does have jurisdiction over all the matters embraced in the Secretary's complaint. *Wirtz v. Bottle Blowers Ass'n, supra.*

Defendant's contention that the action is now moot because of the intervening June 10, 1967 election has also been recently answered by the Supreme Court. In Wirtz v. Bottle Blowers Ass'n, etc., 389 U.S. 463, 475–476, 88 S.Ct. 643, 650, 19 L.Ed.2d 705 (1968), the Court held that:

> "When the Secretary of Labor proves the existence of a § 401 violation that may have affected the outcome of a challenged election, the fact that the union has already conducted another unsupervised election does not deprive the Secretary of his right to a Court order declaring the challenged election void and directing the conduct of a new election under his supervision."

It based this holding on the congressional finding that a new election is the best remedy for insuring "that the officers who achieved office as beneficiaries of violations of the Act would not by some means perpetuate their unlawful control in the succeeding election." (389 U.S. at 474, 88 S.Ct. at 650). The Court further stated: "It is clear, therefore, that the intervention of an election in which the outcome might be as much a product of unlawful circumstances as the challenged election cannot bring the Secretary's action to a halt." 389 U.S. at 474–475, 88 S.Ct. at 650.

It is important to note that in the *Bottle Blowers Ass'n* case, as well as in the instant case, no complaint was filed with the Secretary which challenged the validity of the second election. See, Wirtz v. Local 153, Glass Bottle Blowers Ass'n, etc., 372 F.2d 86, 88 (3d Cir. 1966). The Supreme Court opinion in *Glass Bottle Blowers* also seems to take the wind out of defendant's argument that no purpose would be served by call-

ing a new election, since Fuller did not even run in the 1967 election. It is clear that the Supreme Court considered the public interest as espoused by the Secretary more important than an individual member's interest. First, it indicated that once a complaint triggered an investigation by the Secretary, the *public interest* in securing free and democratic elections and "an honest count of the ballots" would be paramount. 389 U.S. at 470, 88 S.Ct. at 648. "Congress deliberately gave exclusive enforcement authority to the Secretary, having 'decided to utilize the special knowledge and discretion of the Secretary of Labor in order best to serve the public interest.' Calhoon v. Harvey, supra. In so doing, Congress rejected other proposals, among them plans that would have authorized suits by complaining members in their own right." 389 U.S. at 473, 88 S.Ct. at 649.

In essence, the Court was saying that the Secretary's duty to secure free and democratic elections was not limited to the complaint of a single union member. "[The Union] seems to view the act as designed merely to protect the right of a union member to run for a particular office in a particular election. But the Act is not so limited, for Congress emphatically asserted a vital public interest in assuring free and democratic union elections that transcends the narrower interest of the complaining union member." 389 U.S. at 475, 88 S.Ct. at 650.

■ Accordingly, the fact that Fuller did not choose to run, nor the fact that no complaint was ever made to the Secretary relating to the second election is irrelevant once the Secretary has established a violation of the Act respecting the first election and this violation "may have affected the outcome of the election." 29 U.S.C. 482(c).

The question remaining is whether the acts of the Union as charged by the Secretary amounted to violations of the Act. Section 481(e) of the Act provides in part: "Not less than fifteen days prior to the election notice thereof shall be mailed to *each* member at his last known

home address." That section also provides, in regard to nominations: "In any election required by this section which is to be held by secret ballot a reasonable opportunity shall be given for the nomination of candidates \* \* \*."

The undisputed evidence shows that notice of the nomination meeting and of the election was not given to approximately 382 members in good standing. Whether or not such failure to give notice to these members was excusable depends upon whether the Union could have, in the exercise of reasonable care, made certain that all members in good standing would receive notices. The Secretary claims that since the Union was regularly billed by EBLJ, and the June, 1965, billing was for only 2,166 issues, and similar results occurred with respect to the January and March billings, the Union officers were put on notice that not all members as shown by the Union's current membership list had received notices. We think that this evidence shows that the failure to insure notice to all members was not accidental. Similarly, the same facts exist in regard to notices of the nomination meeting. While the officers had no actual notice of this discrepancy, they were put on inquiry notice, and had they exercised reasonable care, they would have discovered that the EBLJ figures were less than their actual membership list, and as a result should have had accurate lists given to EBLJ for mailing to *all* eligible members.

The Secretary also claims that the Trustee election in which complainant Fuller was a candidate was in violation of 29 U.S.C. § 481(c), which provides in part:

"Adequate safeguards to insure a fair election shall be provided, including the right of any candidate to have an observor at the polls and at the counting of the ballots." The Secretary contends that the fact that the election committeemen had been on duty for 24 hours continuously without sleep, and that some of these men were over 65 years of age did not insure a "fair election" in light of the fact that the Secretary's recount of the votes showed Fuller to be tied for first place with Waldal with 277 votes, with Linn having 276 votes. He urges that the union's error in tallying was a result of these conditions. "To safeguard the accuracy of its count, the Union should have provided tellers who were properly rested and unhurried, capable of counting the votes without more then normal human error." (Plaintiff's Opening Brief, pg. 13).

The policy of the Act requires that votes shall be "recorded accurately, efficiently and speedily." N. L. R. B. v. A. J. Tower Co., 329 U.S. 324, 331, 67 S. Ct. 324, 91 L.Ed. 322 (1946). See also, S.Rep. No. 187, 86th Cong., 1st Sess., 20, I.Leg.Hist. 417. The Court finds from the above facts that the conditions under which the vote count was made were not "adequate \* \* \* to insure a fair election." 29 U.S.C. § 481(c).

Our final inquiry is whether this Court can find from a "preponderance of the evidence" that the violations of the Act heretofore found "may have affected the outcome of the election." 29 U.S.C. § 482(c) (2). The Secretary is only required to prove "the existence of a reasonable probability that the election may have been 'affected' by an alleged violation of § 481(e)." Wirtz v. Local Unions 410, etc., International Union of Operating Engineers, 366 F.2d 438, 443 (2d Cir. 1966).

In the contested election only 682 members voted out of 2700 eligible members. The number of members to whom no mailed notice was sent was 382. As the Secretary states in his brief, "It is entirely reasonable to conclude that if, as required by law, each member had been sent an adequate notice by mail, the voter turn-out on the day of the election would have been substantially higher. With more voters casting their ballots, the election results necessarily would have been affected." (Plaintiff's Opening Brief, pg. 17).

We cannot disagree with this conclusion, although as defendant argues,

there was no proof that those members not given notice would have actually voted or did not get notice from sources other than the ELBJ. We do not think that Congress intended the Secretary to come forth with this type of proof in the absence of a showing on the part of defendant. If the union had submitted any evidence supportive of its contentions, then perhaps the Secretary would have had a further burden to meet. However, the union offered no such proof, and, under these circumstances, this Court can only come to the conclusion that the Secretary has met its standard of proof by showing that the violations of the Act heretofore cited *may* have affected the outcome of the election.

Our only function now is to issue the relief as provided in 29 U.S.C. § 482(c), to wit, a new election. While defendant has made a strong argument to the effect that no purpose would be served by ordering a new election, since there were no complaints resulting from the intervening 1967 election, and the only purpose would be to financially burden the union, we do not have a choice of determining whether or not the relief requested should be granted. Congress has indicated that once the court has found that a violation of the Act has occurred, and that such a violation may have affected the outcome of an election, "the court *shall* declare the election * * * to be void and direct the conduct of a new election under the supervision of the Secretary * * *." 29 U.S.C. § 482 (c) [Emphasis supplied]; See, Wirtz v. Bottle Blowers Ass'n, supra, 389 U.S. at 474, 88 S.Ct. 643, 19 L.Ed.2d 705.

Congress did not give this Court the power to weigh various factors in order to determine whether the public interest would be benefitted by the relief prayed for. Instead, it found a new election to be the *only* means by which the purposes of the act would be furthered. Wirtz v. Bottle Blowers Ass'n, supra.

Accordingly, it is hereby ordered that the election of June 19, 1965, be, and the

same hereby is, declared null and void,. and defendant is directed to conduct a new election under the supervision of the Secretary of Labor.

This opinion shall constitute findings. of fact and conclusions of law. The Secretary shall submit an appropriate decree.